# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 1, 2012

## STATE OF TENNESSEE v. CARL RANDLE

### Direct Appeal from the Circuit Court for Madison County
### No. 11-125      Donald H. Allen, Judge

### No. W2011-02374-CCA-R3-CD  - Filed August 27, 2012

A Madison County jury convicted the Defendant, Carl Randle, of aggravated assault and attempted voluntary manslaughter. The trial court merged the convictions and ordered the Defendant to serve six years in the Tennessee Department of Correction. The Defendant appeals, arguing that the evidence is insufficient to support his conviction and that the trial court erred when it denied him an alternative sentence. Finding no error in the judgment of the trial court, we affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Gookin, Jackson, Tennessee, for the appellant, Carl Randle.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION
### I. Facts
### A. Trial

A Madison County grand jury indicted the Defendant for attempted first degree murder and aggravated assault. At a trial on these charges, the parties presented the following evidence: Samuel Evans ("the victim") testified that the Defendant dated his wife's sister, Jaden Moses. The victim said that on December 9, 2010, at around 2:00 or 3:00 p.m., he saw the Defendant at Lincoln Courts apartment complex, where the victim's

mother-in-law lived. The victim explained that he and his wife, Leighasia, were taking their children to stay with his mother-in-law while he and his wife went Christmas shopping. The victim said that he ran into the Defendant in the apartment complex parking lot, and the two spoke briefly. Later in the day, at around 5:00 p.m., the Defendant called the victim at his mother-in-law's apartment, asking for a cigarette. The victim said that he stepped outside his mother-in-law's apartment to give the Defendant a cigarette, but the Defendant never appeared.

The victim testified that, at around 8:00 p.m., the victim, his wife, and Moses went to Wal-Mart, K-Mart, and the mall. At around 9:00 p.m., the Defendant and the victim had an argument over the telephone. The victim said the argument was over his belief that the Defendant was "trying to set me up." The victim did not remember the majority of the conversation but said that he called the Defendant "an S.O.B."

The victim testified that he, his wife, and Moses returned to his mother-in-law's apartment at around 11:00 p.m. As the victim walked to his mother-in-law's apartment, the Defendant approached the victim and said, "What's all that S-H- - you was saying?" The Defendant then pulled out a .32 caliber handgun, placed it against the victim's head and said, "I bet you ain't talking that S-H - - now." The victim testified that he was afraid and did not know what to do. The Defendant pushed the victim with his free hand, and the victim fell to the ground. The victim was lying on his stomach when the Defendant fired a shot into the victim's right buttock, and then Moses and the Defendant fled.

The victim testified that, after being shot, he was "freaked out" and began running in circles because he could not feel his leg. The victim's mother-in-law came outside of her apartment and helped the victim sit down on the front porch. The victim's wife called the police, and the victim was transported to the hospital, where he was treated for the gunshot wound overnight. The victim testified that the bullet remained lodged in his buttock and he continued to experience "sharp pains that shoot down [his] leg into [his] foot."

The victim testified that he did not have a weapon on his person at the time of the shooting. The victim recalled that the Defendant was wearing a blue jacket with the hood pulled up over his head that night. The victim said that, when he first saw the Defendant in the Lincoln Courts parking lot, he told the Defendant he was in town to Christmas shop for his children. The victim said that he had $100 in his wallet and "about 700 on [his] card." The victim clarified that he believed the Defendant was trying "to set [him] up" to rob him when he asked the victim to step outside to give him a cigarette. Even though the Defendant never showed up, the victim was angry about it and expressed as much to the Defendant during their 9:00 p.m. telephone conversation.

2

Leighasia Evans, the victim's wife, testified that the Defendant and her younger sister, Jaden Moses, had a child together. Evans said that, on December 9, 2010, she and the victim brought their children to visit her mother and to do some Christmas shopping in Jackson where her mother lived. When they arrived at her mother's apartment complex, Evans saw the Defendant near the parking lot on the sidewalk. Evans did not speak with the Defendant, but she said the victim spoke with him. Evans said that they spent the afternoon at her mother's apartment and, at one point, the victim went outside to talk with the Defendant. Evans said that the next time the victim spoke with the Defendant was during a telephone conversation that night while they were Christmas shopping. Evans said that she, the victim, and her sister went Christmas shopping together, and the Defendant kept texting and calling Moses on the victim's cellular phone. At some point, the victim answered his cellular phone and spoke with the Defendant briefly. She recalled that the victim called the Defendant a name, because the victim believed the Defendant set him up to be robbed earlier in the day.

Evans testified that she, the victim, and her sister returned to her mother's apartment around 11:00 p.m. that night. As they were walking to the apartment, she saw the Defendant, who was wearing a blue zip-up jacket with a hood over his head, walking toward them. The Defendant walked up to the victim, put a gun to his head and said, "What's all that sh** you was talking about earlier?" Evans said she heard a gunshot and then saw the victim on the ground. The Defendant and Moses "wrestl[ed] a little bit" and then they both fled. Evans said that she beat on her mother's front door while the victim ran around "hysterical" because he was "hurting and in shock." The victim was treated at the hospital for a gunshot wound to his buttock.

Daniel Long, a Jackson City Police Department investigator, testified that, on December 9, 2010, he responded to a call about a shooting at Lincoln Courts apartment complex. Investigator Long recalled that, when he arrived, the victim was lying on the steps in front of an apartment. The victim told Investigator Long that the Defendant had shot him and Investigator Long observed a gunshot to the victim's buttock. An ambulance was called to the scene and the victim was transported to the hospital for treatment. Investigator Long said that neither a weapon nor bullet were recovered from the scene.

Jaden Moses testified, on the Defendant's behalf, that she and the Defendant were in a relationship and had a child together. Moses said that on December 9, 2010, she went to her mother's house at around 4:30 p.m. or 5:00 p.m. When she arrived, her sister and the victim were there. At some point, she left to go to her GED orientation and the victim also exited the apartment at the same time to go to his car. Moses said that she returned to her mother's home at around 7:00 p.m. or 8:00 p.m. The victim and Moses's sister were going Christmas shopping for their children, so Moses joined them. While they were out that night, Moses overheard the victim call the Defendant a curse word during a telephone conversation.

3

Moses testified that she, her sister, and the victim returned to her mother's apartment at around 10:30 p.m. or 11:00 p.m. As they were getting out of the victim's car, Moses saw the Defendant walking toward them. The Defendant approached, and he and the victim began arguing. Moses said she could not tell what they were arguing about and that she was "confused." The argument continued as they walked toward the apartment and, when they reached the porch of the apartment, the two men began shoving one another. Moses said that she could not see what happened because it was "real dark outside," but she heard a gun fire, and the victim began "hollering." Moses did not see either the Defendant or the victim with a gun that night. After the gunshot, the Defendant ran and Moses followed him. When she caught up with him, they began arguing. Moses asked the Defendant what had happened, and the Defendant replied that he did not know. The Defendant then ran again, and Moses returned to the Defendant's mother's apartment and told her what had occurred.

On cross-examination, Moses denied ever telling the victim that the Defendant was setting the victim up to rob him when the Defendant asked the victim to bring him a cigarette. Moses said that the victim initiated the phone call that she overheard between the victim and the Defendant. Moses said that, on the night of the shooting, the Defendant wore a blue jacket with the hood pulled over his head. She said that, when the Defendant approached the victim after they returned from Christmas shopping, the Defendant was mad, but it was the victim who first pushed the Defendant. Moses maintained that the Defendant did not have a gun that night. Moses confirmed that she never spoke with police regarding the events of that night.

The Defendant testified that, on the day of the shooting, he briefly spoke with the victim at 1:00 p.m. or 2:00 p.m. At around 5:00 p.m. the two "made contact on the phone" to arrange for the Defendant to meet the victim at the Lincoln Courts apartment complex to sell the victim "some crack cocaine." The Defendant said that he was not surprised by the victim's request because he had sold the victim drugs on previous occasions. Although the two arranged the location, they did not set a specific time to meet. The Defendant was watching his sister's children, so he could not leave but sent "the dude named Justin" to sell to the victim. The victim later called the Defendant, and he was "real paranoid" and "nervous." The victim told the Defendant that he did not want any one else to sell drugs to him, only the Defendant. The Defendant denied being angry about the conversation and said that he "was like, you know, okay."

The Defendant testified that, at around 10:30 p.m. or 11:00 p.m., the victim called him and asked him to meet again. The Defendant walked from a friend's house to Lincoln Courts apartment complex and waited for the victim to arrive. When the victim arrived at the apartment complex, he again called the Defendant's cellular phone to tell him that he had returned from shopping. The Defendant recalled that he met with the victim, they spoke

4

briefly, and, when the Defendant "got ready to sell him the dope," the victim pulled a gun out from his fleece jacket. The Defendant said he was "shocked" and "afraid." He reached out, grabbed the victim's arms and the two men began "scuffling." The Defendant said that he held the victim's arm toward the ground to prevent the victim from shooting either himself or the Defendant. The men wound up on the ground where the Defendant had the victim's arm bent back and then the gun "went off." After the gun fired, the Defendant was scared and fled to a friend's apartment in Lincoln Courts, where he remained for the night. The Defendant said that he did not contact police because he was scared and did not know what had happened.

The Defendant testified that, the following day, his mother called and told him the police were waiting for him at his sister's house. After speaking with the police over the phone, he returned to his sister's house and turned himself in to the police. The Defendant agreed that he did not initially tell police officers the truth. He apologized for making a false statement and explained that he was scared and had never been to jail before this incident. He was afraid that, if he told the police he was selling drugs, he would receive charges for that conduct.

On cross-examination, the Defendant agreed that, when he first saw the victim in the afternoon, the victim told him he was going Christmas shopping for his children. Even though in his police statement the Defendant said that he called the victim asking for a cigarette, the Defendant denied ever making such a call. He explained that he made up the story, because he did not want to tell police that the phone calls were about drugs. The Defendant agreed that he initially told police that he was arguing with Moses nearby when the victim was shot.

The State called Danielle Jones, a Jackson City Police Department investigator, as a rebuttal witness. Investigator Jones testified that she interviewed the Defendant after his arrest. The investigator wrote down the events of the previous night, as described by the Defendant, had the Defendant review the statement to make sure it was correct, and then asked the Defendant to sign it. Investigator Jones identified the signed rights waiver form and the Defendant's signed statement. Investigator Jones read the Defendant's statement as follows:

The dude that got shot is [the victim]. He is my girlfriend's brother-in-law. I have known him about a year and three months. Yesterday Josh, a dude I know from the area, told my girlfriend, Jaden Moses, that I sent him to jump on [the victim]. She saw him about to do it and called his name and he stopped and that's when he told her that. [Moses] told [the victim] that and he started calling my phone trying to confront me about it. I had nothing to do

5

with that. I was at my sister, Tereva Thompson's house. Me and [Moses] got into it over that. Around 11:00 that night I saw [the victim] and his wife, Leighasia, at Leighashia's [sic] mom's house. [Moses] was with him. [Moses] came to me when she saw me walking in Lincoln Courts. I was backing back because I know [Moses] likes to fight. She came to me and we had an altercation. When [the victim] was shot, he was by [Moses's] mom's house. Me and [Moses] were still having an altercation. I think they said I shot [the victim] because Josh put me in it earlier. Before the Josh incident, I called [the victim] and asked him if he had any cigarettes. He said he did and I asked him to bring me one and he said okay. It was early when I talked to him. I couldn't meet [the victim] and get the cigarette because I was doing something for my sister. [Moses] doesn't have a cell phone, but she lives at 156D Lincoln Circle.

Based upon this evidence, the jury convicted the Defendant of aggravated assault and attempted voluntary manslaughter.

**B. Sentencing Hearing**

At the sentencing hearing, the parties presented the following evidence: The Defendant testified that he had been incarcerated since December 10, when he turned himself in to police on the day after the shooting. The Defendant stated that he was nineteen years old and eighteen at the time of the shooting. The Defendant attended high school through the eleventh grade and then obtained his GED in 2009. The Defendant testified that he was employed at Kirkland's Warehouse and "did other landscaping work for this guy that I know." The Defendant acknowledged that, as a juvenile, he spent time in State custody.

The Defendant expressed his desire for an alternative sentence in order to "be there" for his one-year-old son and family. He also stated his interest in furthering his education. The Defendant acknowledged that, even though he had been selling drugs before his incarceration, he could comply with probation conditions prohibiting him from "being around" drugs. The Defendant testified that, if granted an alternative sentence, he would live with his mother.

The Defendant expressed remorse over the shooting and apologized for his role. He stated his desire to change his "way of living" in order to make a better future for himself and his family.

On cross-examination, the Defendant agreed that he was found delinquent as a juvenile and placed in State custody on three occasions for three separate acts.

Jaden Moses testified that she obtained her GED but was unemployed. Moses stated that she was having a hard time raising their child alone. She spoke of telephone conversations with the Defendant, during which he talked about reading the Bible and attending church.

After hearing the evidence, the trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction. The trial court noted its consideration of the presentence investigation report, the evidence presented at the hearing, and the parties' arguments. Further, it considered the nature of the conduct, the victim's statement, trial testimony, the Defendant's previous criminal conduct, potential for rehabilitation, and enhancement and mitigating factors. The trial court ordered the Defendant to serve a six-year sentence and denied alternative sentencing. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant asserts that the evidence is insufficient to support his conviction and that the trial court erred when it denied an alternative sentence. The State responds that the State proved beyond a reasonable doubt that the Defendant shot the victim in the buttock with a gun and that the trial court properly denied alternative sentencing after considering all relevant facts and the principles of sentencing.

## A. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his conviction for aggravated assault based upon the Defendant's testimony that it was the victim who brandished the gun. The State responds that the jury was entitled to credit the State's witness who testified that the Defendant approached the victim, pointed a gun at him, and then shot the victim in the buttock. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be

given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marble v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)), *superseded in part by statute*, Tenn. R. Crim. P. 33, *as recognized in State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of aggravated assault. The relevant portion of the

aggravated assault statute provides that a person commits aggravated assault who "[i]ntentionally or knowingly commits an assault" and "[u]ses or displays a deadly weapon." T.C.A. § 39-13-102(1)(A) (2010). "A person commits assault who: (1) [i]ntentionally, knowingly or recklessly causes bodily injury to another; (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." T.C.A. § 39-13-101(a)(1)-(3) (2010). Tennessee Code Annotated section 39-11-106(a)(5)(B) defines deadly weapon as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Serious bodily injury means bodily injury which involves: "(A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F)A broken bone of a child who is eight (8) years of age or less." T.C.A. § 39-11-106(a)(34)(A)-(F) (2010).

The evidence, viewed in the light most favorable to the State, showed that the Defendant and the victim spoke on the telephone earlier in the evening in a heated manner, during which the victim cursed at the Defendant. When the victim returned to his mother-in-law's apartment, the Defendant approached, pulled a gun from his jacket, and pointed the gun at the victim's head. The Defendant shoved the victim, who fell on the ground face down, and the Defendant fired the gun, shooting the victim in the right buttock. The Defendant then fled. The victim was transported to the hospital, where he was treated overnight for a gunshot wound. Accordingly, the evidence is sufficient to prove beyond a reasonable doubt that the Defendant committed aggravated assault by shooting the victim with a gun.

The Defendant claims that the evidence is insufficient in light of his testimony that it was the victim who brandished the gun. The State, however, presented three witnesses who offered contrary testimony that it was the Defendant who approached the victim with a gun and shot him. We note that it is the jury's prerogative to evaluate and weigh the evidence. By its verdict, the jury exercised its prerogative and chose to accredit the testimony of the State's witnesses. It is the jury who is charged with making credibility determinations, not this Court. *Smith*, 24 S.W.3d at 278. It is not the function of this Court to reweigh the credibility of witnesses on appeal. *Id*. at 278-79. There was sufficient evidence to support a jury finding that the Defendant committed aggravated assault. We will not disturb their decision. The Defendant is not entitled to relief as to this issue.

**B. Sentencing**

The trial court sentenced the Defendant as a Range I, standard offender to six years

9

for his Class C felony aggravated assault conviction. The Defendant appeals this decision, arguing that the trial court erred when it denied him an alternative sentence. The State responds that, because the trial court's findings are supported by the record, no sentencing error occurred. We agree with the State.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, Tennessee Code Annotated section 40-35-103 (2010), the appellate court may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a *de novo* review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 & -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103(5) (2010).

Due to the 2005 amendments to the Sentencing Reform Act, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-102(6) (2006)). Instead, a defendant not within "the parameters of subdivision (5) [of T.C.A. § 40-35-102], and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the

contrary." *Id*. (footnote omitted); *see also* T.C.A. § 40-35-102(6) (2010); 2007 Tenn. Pub. Acts 512. Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider " them. T.C.A. § 40-35-102(6)(D) (2010).

A defendant seeking probation bears the burden of "establishing [his] suitability." T.C.A. § 40-35-303(b) (2010). As the Sentencing Commission points out, "even though probation must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303 (2010), Sentencing Comm'n Cmts.

When sentencing the defendant to confinement, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1)(A)-(C) (2010). In choosing among possible sentencing alternatives, the trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment." T.C.A. § 40-35-103(5) (2010); *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. *See State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also State v. Bunch*, 646 S.W.2d 158, 160-61 (Tenn. 1983); *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); *Dowdy*, 894 S.W.2d at 305-06.

At the conclusion of the sentencing hearing in this case, the trial court determined the Defendant would be sentenced as a Range I, standard offender. The trial court stated that, in determining the Defendant's sentence, it was considering the evidence adduced at the trial and the sentencing hearing in this case, the presentence report, the principles of sentencing and arguments as to sentencing alternatives, the nature and characteristics of the Defendant's criminal conduct, the evidence of applicable statutory mitigating and enhancing factors, and the Defendant's potential for rehabilitation. Specifically, the trial court reviewed the Defendant's criminal history, which spanned five and a half years. The Defendant's criminal activity began in 2005 when the Defendant was twelve years old and the current charge

occurred in 2010, about six months after the Defendant turned eighteen years old. The trial court noted that, during this time period, the Defendant appeared before a judge or had been in court for offenses thirteen times. Many of the offenses involved a victim and, although these offenses occurred while the Defendant was a juvenile, some of the charges would have constituted misdemeanor and felony convictions for an adult. After considering enhancement and mitigating factors, the trial court set the length of the Defendant's sentence at six years.

The trial court then considered the statutory factors for determining whether to order a sentence of confinement. The trial court considered the seriousness of the offense finding:

> [T]his is a situation where [the victim] still lives with the pain that was inflicted by [the Defendant]. According to [the victim impact statement] the victim says that he still lives in fear as a result of being shot by [the Defendant]. He recalls . . . having a gun pointed at his head. He recalls being pushed to the ground and being shot and not knowing if he is going to live or die. I can't imagine having to experience that. To have someone standing over you with a gun, pointing it at you and then shooting you and not knowing if you are going to live or die. . . . [The victim] still suffers today. He still has [a] bullet in his buttocks as a result of [the Defendant] shooting him.
>
> . . . .
>
> Obviously this is about as serious as it gets when someone pulls out a loaded gun and shoots another person within a matter of a few feet. Certainly that's serious circumstances.
>
> . . . .
>
> Any type of probation in this case would certainly unduly depreciate the seriousness of these offenses.

The trial court then noted that the Defendant's expressed regret over the shooting and apology to the victim during the sentencing hearing was inconsistent with the Defendant's testimony at trial that the victim pulled the gun on the Defendant. The trial court recalled that the Defendant testified at trial that he did not know how the victim got shot and denied any contact with the gun. The trial court stated that this trial testimony was "totally inconsistent with the proof in this case." The trial court considered the Defendant's history of juvenile criminal offenses and the Defendant's risk of recidivism, stating, "I do find that the possibility of future criminal conduct is great in this case." Finally, the trial court found that measures less restrictive than confinement had been applied unsuccessfully:

Judge Little tried many times to rehabilitate [the Defendant]. She even had to send him off to the Department of Children's Services custody three different times and he never changed. He continued to get worse and worse . . . up until the point that he is now an adult carrying a loaded handgun during the time that he is out selling crack cocaine.

Based upon these findings, the trial court denied the Defendant an alternative sentence.

The Defendant is responsible for showing that the trial court improperly sentenced him, and we conclude that he did not meet this burden. The Defendant was adjudicated delinquent multiple times, resulting in his being assigned to State custody three times between the ages of twelve and seventeen. Despite court attempts at intervention while the Defendant was still a minor, the Defendant continued his criminal conduct by selling illegal drugs at the age of eighteen. Further, in this case, the Defendant stood over an unarmed man who, at the time, was lying on his stomach on the ground and shot him before fleeing the scene. The Defendant later gave various accounts of the shooting at different stages of the disposition of his charges. At trial, the Defendant still denied any culpability for the shooting, essentially blaming the shooting on the victim who he claimed possessed the weapon. This supports the trial court's denial of an alternative sentence based upon the Defendant's history of criminal conduct, lack of potential for rehabilitation, and the seriousness of the offense.

Based upon the foregoing, we conclude that the trial court appropriately followed sentencing guidelines, made findings of fact adequately supported by the record, and gave due consideration to Sentencing Act principles and factors. We, therefore, affirm the judgment of the trial court.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

13